IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PHILIP B. SAUER,

               **Plaintiff,**

    v.                                       **1:14-cv-698-WSD**

PUBLISHER SERVICES, INC.,

               **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant Publisher Services, Inc.'s

("Defendant") Motion for Summary Judgment [36] ("Motion").

## I.    BACKGROUND[1]

### A.    Summary

Plaintiff Philip B. Sauer ("Plaintiff") is an engineer who currently resides in

Pennsylvania. (Defendant's Statement of Material Facts [36.11] ("DSOMF") ¶ 1).

---

[1] As required when considering a motion for summary judgment, the Court has viewed the evidence and factual inferences in the light most favorable to Plaintiff, the nonmoving party. See United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). To the extent that material facts are in dispute, the Court has resolved the disputes in Plaintiff's favor. See Vaughan v. Cox, 343 F.3d 1323, 1326 n.1 (11th Cir. 2003). The facts recited in this section are intended to establish the context of the case. Additional facts will also be recited below.

Defendant is a warehouseman, manufacturer's representative, and marketer/distributor of board games in the United States, and works with several board game companies.  (Id. ¶ 12).  Defendant also holds, whether by consignment or otherwise,[2] approximately $4.5 million in board games and toys.  Defendant sells these board games and toys to retailers and wholesalers.  (Plaintiff's Response to DSOMF [39.8] ("Pl.'s Resp. DSOMF" ¶ 12).

In 2012, Plaintiff sued and obtained judgments against Valley Games, Inc. ("Valley Games"), a board game company.  The actions Plaintiff brought against Valley Games were based on loans Plaintiff made which were not repaid.  Valley Games is a client of Defendant, and produced a board game called D-Day Dice.  While litigation was ongoing between Plaintiff and Valley Games, Valley Games transferred the rights to D-Day Dice to a new entity called Radiant Darkstar.  Plaintiff claims that Defendant helped Valley Games transfer D-Day Dice inventory to Radiant Darkstar, while Defendant knew of litigation or anticipated litigation against Valley Games.  Plaintiff claims Defendant then took possession of the D-Day Dice inventory, sold it on behalf of Valley Games and Radiant

---

[2]     Plaintiff states that Defendant owns $4.5 million in board games and toys, but the deposition testimony to which Plaintiff cites notes that Defendant owns this property by consignment.  (Deposition of Lisa Eidson [45] ("Eidson Dep.") at 25:17-20).  As explained below, the parties dispute whether Defendant has a consignment relationship with third parties that are central to this action.

Darkstar, and remitted payment to Radiant Darkstar.  Plaintiff claims that Defendant's actions were fraudulent, because Defendant's actions helped Valley Games avoid Plaintiff's collection on its judgments against Valley Games.

On February 14, 2014, Plaintiff filed, in the Superior Court of Gwinnett County, Georgia, a three-count (3) Complaint against Defendant for fraud, conspiracy to defraud, and fraudulent conveyance of property under Georgia's Uniform Fraudulent Transfer Act ("UFTA"), O.C.G.A. § 18-2-70, et seq.  On March 10, 2014, Defendant removed the action to the Court on the basis of diversity jurisdiction.

B.   Plaintiff's Loans to Valley Games, Judgment Against Valley Games, and Garnishment Action

Valley Games, a client of Defendant since 2003 or 2004, (DSOMF ¶ 15), designed and produced custom board games that were stored in Defendant's warehouse facilities.  On March 23, 2010, Valley Games gave to Plaintiff a promissory note, in which Valley Games promised to repay $155,000 loaned by Plaintiff to Valley Games (the "Pennsylvania loan").  (Id. ¶ 8).  On July 7, 2010, Valley Games gave Plaintiff four additional promissory notes, in which Valley Games promised to repay $186,750, the aggregate amount loaned by Plaintiff to Valley Games (the "California loans").  (Id. ¶ 10).  In April 2012, Valley Games defaulted on the promissory notes to repay the Pennsylvania and California loans

(collectively, the "Loans").

Plaintiff subsequently filed lawsuits in Pennsylvania and California against Valley Games based on Valley Games's alleged failure to repay the Loans. (Id. ¶ 11). On November 16, 2012, Plaintiff obtained a default judgment against Valley Games in the amount of $127,305.33, in the Court of Common Pleas, Lancaster, Pennsylvania (the "Pennsylvania judgment"). On December 12, 2012, Plaintiff obtained a default judgment against Valley Games in the amount of $125,461.00, in the Superior Court of Los Angeles, California (the "California judgment"). (See id.). In late January, 2013, Plaintiff domesticated the Pennsylvania judgment in the Superior Court of Gwinnett County, Georgia. (Id. ¶ 46).

On January 21, 2013, Plaintiff served a garnishment action (the "Garnishment") on Defendant based on the domesticated Pennsylvania judgment. (Id. ¶ 49). Defendant claims it properly responded to the Garnishment and paid funds into the registry of the court. (Id. ¶ 51). Plaintiff claims Defendant has not paid Plaintiff money for sales of D-Day Dice inventory. (Pl.'s Resp. DSOMF ¶ 51). A further history of this matter puts Plaintiff's action into context.

C.   Defendant's Knowledge of Plaintiff's Litigation or Anticipated Litigation Against Valley Games

In February 2012, Plaintiff attempted to send Defendant an unsolicited

"Notice to Warehouseman and Waiver of Liens" (the "Notice"), dated February 27, 2012, purporting to be associated with the Loans he made to Valley Games.

On or about April 24, 2012, Defendant's President, Dean Burnham, received an unsolicited email and phone call from Plaintiff.  (Id. ¶ 13).  In the communications, Plaintiff told Mr. Burnham that he was an investor in Valley Games and that he was worried about his investment.  (Id. ¶ 14).  He told Mr. Burnham he wanted to "avoid placing [Valley Games] into bankruptcy."  (Pl.'s Resp. DSOMF ¶ 14).  Plaintiff told Mr. Burnham that Valley Games had not paid loans extended to it by Plaintiff, and that Plaintiff had a security interest in Valley Games's inventory held by Defendant.  (Id.).  Plaintiff did not tell Mr. Burnham that he had only a security interest in specific games, not all of Valley Games's inventory.  (DSOMF ¶ 26).  He did not tell Mr. Burnham that he was suing or about to sue Valley Games in California and Pennsylvania.  (Id. ¶¶ 27, 28).[3]

Mr. Burnham did not receive the Notice that Plaintiff sent in February 2012.

---

[3]     Plaintiff and Mr. Burnham did not speak again until after Mr. Burnham was deposed in March 2013, in connection with the state court actions against Valley Games.  (Id. ¶ 29).

Plaintiff re-sent the Notice after the April 24, 2012, phone call.  (<u>Id.</u> ¶ 16).[4]  The email correspondence from Plaintiff to Mr. Burnham in which the Notice was transmitted states "PLEASE ask any questions you find relevant.  I'm trying desperately to avoid forcing Valley Games into bankruptcy, but it appears to be a lost cause due to their lack of cooperation in this matter."  (Pl.'s Resp. DSOMF ¶ 24; Eidson Dep. [45] Ex. 7 at 2).  Plaintiff claims that the Notice sufficed to provide Defendant notice of Plaintiff's claim against inventory held by Defendant.  (Pl.'s Resp. DSOMF ¶ 19).  Defendant claims the Notice did not identify the "Inventory" referenced in the Notice.  (DSOMF ¶ 20).  Plaintiff claims the inventory referenced is inventory of Valley Games.  (Pl.'s Resp. DSOMF ¶ 20).  When the Notice was received, Defendant had in its warehouse numerous games belonging to Valley Games.  (DSOMF ¶ 21).  Defendant claims Mr. Burnham did not sign the Notice or otherwise agree to its terms, and that Mr. Burnham did not believe the Notice imposed a legal obligation on Defendant.  (DSOMF ¶¶ 23, 25).

On May 7, 2012, Mr. Burnham sent the Notice to Torben Sherwood, an owner of Valley Games, telling Mr. Sherwood "I'd like to talk with you ASAP regarding this letter."  (Pl.'s Resp. DSOMF ¶ 23; Eidson Dep. Ex. 7 [45.7] at 1).

---

[4]     At the time Mr. Burnham received the Notice, Plaintiff had not yet secured a judgment against Valley Games.  (<u>See</u> <u>id.</u> ¶ 18).

Defendant claims that, at the time the Notice was received, Mr. Burnham was not aware of any specific loan agreements in place between Plaintiff and Valley Games.  (DSOMF ¶ 24).

Shortly after Mr. Burnham sent the Notice to Mr. Sherwood, the two spoke about Plaintiff's status as a creditor of Valley Games.  (Plaintiff's Statement of Material Fact ("PSOMF") [39.9] ¶ 4).

On July 31, 2012, Mr. Sherwood sent an email (the "July 31st Email") to Mr. Fredrick Woodruff, an employee of Defendant, and to Mr. Burnham with the "Subject: D Day Dice Inventory."  The email states:

> Just wanted to get something sorted out where we have the inventory of D-Day Dice under PSI control. This would be all of the inventory that we plan on releasing down the road as well as the accessory items.  We talked on the phone Dean about PSI doing a promissory note or something like it to make sure it was immune to legal issues.
>
> Ross had advised that PSI would likely pick up the remaining inventories on Hannibal, Republic of Rome and Stronghold to sell normally instead of us using them in our inventory reduction sale.
>
> We need to get this sorted out as soon as possible. Can you advise what PSI is willing to do and we can get that done right away so we avoid issues.

(PSOMF ¶ 8).  As of July 31, 2012, Mr. Burnham was aware that Valley Games sought to protect the inventory of D-Day Dice from legal issues related to Plaintiff. (Id. ¶¶ 10-11).

D.      Defendant's Relationship With Radiant Darkstar

Defendant claims that, in late November 2012, Mr. Woodruff, Defendant's employee, informed Defendant that a new company, Radiant Darkstar, now owned the rights to the game D-Day Dice.  (DSOMF ¶ 30).  The parties dispute whether Defendant was involved in the creation of Radiant Darkstar, including the scope of Woodruff's authority to act on behalf of Defendant.  Plaintiff argues that Mr. Woodruff initiated a request to Mr. Sherwood to form Radiant Darkstar, and that Mr. Woodruff, as a Senior Buyer and account liaison with Valley Games, has the authority to bind Defendant.  (Pl.'s Resp. DSOMF ¶¶ 82, 92).  Defendant claims that Mr. Woodruff had "no ownership stake or managerial responsibility" at Valley Games.  (DSOMF ¶ 30).  Plaintiff claims that Mr. Woodruff was a Senior Buyer for Defendant and was Defendant's account liaison with Valley Games.  (Pl.'s Resp. DSOMF ¶ 30).  Defendant claims that it had nothing to do with the creation of Radiant Darkstar, and that Mr. Woodruff does not have the authority to bind Defendant to a contractual agreement.  (DSOMF ¶¶ 82, 92).[5]

---

[5]      Defendant claims that the first print run of D-Day Dice was produced by Valley Games, and that the second print run was produced by Radiant Darkstar.  (See DSOMF ¶ 31).  Plaintiff claims that both print runs were produced by Valley Games, noting that, even after the second print run, the D-Day Dice box stated that it is published by Valley Games, and the UPC codes for the first and second print runs are the same.  (Pl.'s Resp. DSOMF ¶ 31).

On November 28, 2012, Mr. Woodruff sent Mr. Sherwood an email stating: "I will need your new company information, address, bank info and the like.  I will also need your new stock # and UPC etc for your new game, D Day Dice.  Let me know ASAP." (PSOMF ¶ 16).  The same day, Mr. Sherwood sent an email (the "November 28th Email") to Mr. Woodruff requesting that Defendant "pa[y] for and manage[] [D-Day Dice] under Radiant [Darkstar], not Valley Games."  (Id. ¶ 34).  The email stated:  "Please, though, if this product could be separate from the Valley Games product so that there's no confusion in case of a seizure."  (Id. ¶ 35).[6]  Defendant states that, at the time of this email, Defendant had no knowledge of the litigation between Plaintiff and Valley Games.  (Id. ¶ 36). Plaintiff argues the July 31st email between Mr. Burnham, Mr. Sherwood, and Mr. Woodruff, which is discussed above, shows that Defendant did, in fact, have knowledge of litigation between Plaintiff and Valley Games.[7]

---

[6]    Mr. Burnham did not receive Mr. Sherwood's email.  (DSOMF ¶ 38).

[7]    Defendant claims that, from Mr. Woodruff's standpoint at the time he was informed of the transfer of D-Day Dice from Valley Games to Radiant Darkstar, "there was nothing inherently illegal, immoral or otherwise 'wrong' or 'alarming' about one company transferring its intellectual property rights to another." (DSOMF ¶ 32).  Over the years, Defendant has had vendors that use multiple names, have changed names, or opened accounts with Defendant utilizing different names.  (DSOMF ¶ 33).

In response to the November 28th Email, Defendant entered into a contractual relationship with Radiant Darkstar, which Defendant claims created a consignment relationship between Defendant and Radiant Darkstar.  (DSOMF ¶ 40).[8]  Defendant claims that it has a similar contractual agreement with Valley Games, but that the writing evidencing the agreement has been lost.  (Id. ¶ 43). Plaintiff contends that Defendant and Valley Games did not enter into a written agreement.  (Pl.'s Resp. DSOMF ¶ 43).  Defendant claims further that, under its contract with Valley Games, certain inventory is consigned to Defendant to be sold and distributed from Defendant's warehouse to purchasers in the marketplace. (DSOMF ¶ 44).  Defendant claims that, because a consignment relationship exists, Defendant does not possess and did not take title to D-Day Dice inventory. Plaintiff disputes that a consignment relationship exists between Defendant and Valley Games.  (See, e.g., Pl.'s Resp. DSOMF ¶ 61).

On March 8, 2013, at a deposition taken in Plaintiff's Pennsylvania action, Mr. Burnham conceded that one of Defendant's employees aided and abetted Valley Games's fraudulent avoidance of Plaintiff's claims.  (PSOMF ¶ 21; Def.'s

---

[8]     The parties have a written contract setting forth the terms of their business relationship.  (Id. ¶ 41).  The contract does not state that Defendant and Radiant Darkstar are partners or that one can bind the other.  (Id. ¶ 42).  The agreement does not describe the relationship between Radiant Darkstar, Valley Games, and Defendant as a consignment.

Resp. PSOMF [47] ¶ 21; Burnham Dep. [41] at 56-57).  Mr. Burnham later

retracted this testimony when he was deposed in this action.  (Id. ¶ 22).  Mr.

Burnham does not dispute (i) that Valley Games sought to avoid Plaintiff's claims

to D-Day Dice inventory, or (ii) that Plaintiff's lawsuit against Valley Games

caused Valley Games to transition D-Day Dice to a new company, Radiant

Darkstar.  (PSOMF ¶ 23).

On or about January 21, 2013, when the Garnishment was served on

Defendant, Defendant had over 2,100 units of D-Day Dice in inventory.  (Id. ¶ 47).

Defendant sold approximately 3,504 units of D-Day Dice.  (PSOMF ¶ 46).

Defendant remitted payments to Radiant Darkstar for these D-Day Dice sales.  (Id.

¶ 48).

## II.   DISCUSSION

### A.   Legal Standard

Summary judgment is appropriate where the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter

of law.  See Fed. R. Civ. P. 56.  The party seeking summary judgment bears the

burden of demonstrating the absence of a genuine dispute as to any material fact.

Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the

moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246.  The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

      B.    Analysis

          1.    Existence of a Partnership

Plaintiff alleges that Defendant is a "partner" of Valley Games and Radiant Darkstar.  (Compl. [1.1] ¶¶ 7, 50, 72, 92).  This allegation appears to be in support of an alternate theory of liability under Georgia's UFTA that Plaintiff has abandoned.  Defendant presents evidence showing that it was not a partner of Valley Games or Radiant Darkstar.  (Mot. at 11).  Defendant argues that it is not a partner including because does not have an arrangement whereby it shares profits with Valley Games and Radiant Darkstar.  Plaintiff did not respond to Defendant's argument, and it is therefore deemed unopposed.  See LR 7.1(B), NDGa.  The Court concludes that Defendant was not a partner of Valley Games or Radiant Darkstar.

2. <u>UFTA Claim</u>

Defendant moves for summary judgment on Plaintiff's UFTA claim, arguing that Defendant cannot be held liable under Georgia's UFTA because Defendant was not aware of any legal action against Valley Games, and because Defendant was not a party to the transfer of any D-Day Dice inventory. (Mot. at 15-16). Defendant argues that it received all of its D-Day Dice inventory from Valley Games or Radiant Darkstar on consignment, and therefore it never owned or took title to any of the D-Day Dice inventory at issue. (<u>Id.</u> at 16).

In 2002, Georgia adopted the UFTA, which is modeled on the Uniform Fraudulent Transfer Act promulgated by the National Conference of Commissioners on Uniform State Laws. The UFTA was adopted in various forms by 43 states and the District of Columbia. <u>Bishop v. Patton</u>, 706 S.E.2d 634, 639 (Ga. 2011), <u>disapproved on other grounds by</u> <u>SRB Inv. Svs. v. Branch Banking & Tr. Co.</u>, 709 S.E.2d 267 (Ga. 2011). Georgia's UFTA is "an additional tool for the detection, prevention, and remediation of fraudulent transfers." <u>Id.</u> The "overriding purpose of the UFTA is to provide relief for creditors whose collection on a debt is frustrated by the actions of a debtor to place the putatively satisfying assets beyond the reach of the creditor." <u>Thompson v. Hanson</u>, 219 P.3d 659, 665 (Wash. 2009) (en banc).

14

Under Georgia's UFTA, a creditor can seek to set aside transfers of property by the debtor, "if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."  O.C.G.A. § 18-2-74(a)(1).  To determine a debtor's intent, a court may consider the open-ended set of factors listed in O.C.G.A. § 18-2-74(b)—commonly called the "badges of fraud."  RES-GA Hightower, LLC v. Golshani, 778 S.E.2d 805, 807 (Ga. Ct. App. 2015).  A creditor cannot, however, seek to void a transfer "against a person who took in good faith and for a reasonably equivalent value . . . ."  O.C.G.A. § 18-2-78(a).  "[I]n light of the dearth of Georgia decisions construing the provisions of the Georgia UFTA," a court in Georgia generally "look[s] to the decisions of other jurisdictions for guidance."  Truelove v. Buckley, 733 S.E.2d 499, 501 (Ga. Ct. App. 2012).

a)       Intent to Hinder, Delay, or Defraud

The parties here do not dispute that Plaintiff is a creditor of Valley Games and that Valley Games is thus a debtor.[9]  Defendant's position is that it was not aware of any litigation against Valley Games, and thus it did not have the intent to

---

[9]       Under Georgia's UFTA, a "creditor" is broadly defined as "a person who has a claim," a "debtor" means a "person who is liable on a claim," and a "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  O.C.G.A. § 18-2-71(3), (4) & (6).

hinder, delay, or defraud Plaintiff.  Both Plaintiff and Defendant offer very different views whether, when Defendant received the inventory in question, it was aware of the pending litigation against Valley Games and whether Defendant intended to defraud Plaintiff.

Cases from several jurisdictions, including Georgia, in interpreting the UFTA, "consistently hold that the intent of the transferee is irrelevant in determining whether a money judgment is appropriate" where a debtor, intending to defraud a creditor, transfers property to a third party.  United States v. Sherrill, 626 F. Supp. 2d 1267, 1276 (M.D. Ga. 2009).  In Truelove v. Buckley, the Georgia Court of Appeals held: "it is noteworthy that Georgia's UFTA no longer contains language regarding a *transferee's* intent . . . [t]hus, the fact that [the transferee] had no knowledge that [the transferor] had an outstanding judgment against him is irrelevant under the current version of UFTA" in determining whether judgment may be entered against the transferee.  733 S.E.2d at 502. (alterations omitted, emphasis in original); see also Warfield v. Byron, 436 F.3d 551, 559 (5th Cir. 2006) (recognizing that a transferee's knowing participation in a fraudulent conveyance is irrelevant under Washington's UFTA); Anderson v. Michaelson, 127 F. App'x 253, 257 (9th Cir. 2005) (noting that a transferee's intent under Arizona's UFTA is immaterial to setting aside fraudulent transfers to a transferee).

The relevant inquiry under the UFTA is whether "the *debtor* made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."  O.C.G.A. § 18-2-74(a)(1) (emphasis added).

The Court thus addresses whether Valley Games, the debtor, made a transfer to Defendant with actual intent to hinder, delay, or defraud Plaintiff.  "Because such fraud is rarely committed or admitted openly, actual intent to hinder, delay or defraud creditors is seldom susceptible to direct proof."  Bishop, 706 S.E.2d at 640.  In determining intent, consideration may be given to an open-ended set of factors listed in O.C.G.A. § 18-2-74(b), which are also commonly called the "badges of fraud."  Golshani, 778 S.E.2d at 807.  These badges of fraud include whether:

(1)   The transfer or obligation was to an insider,
(2)   The debtor retained possession or control of the property transferred after the transfer,
(3)   The transfer or obligation was disclosed or concealed,
(4)   Before the transfer was made the debtor had been sued or threatened with suit,
(5)   The transfer was of substantially all of the debtor's assets;
. . .
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; . . . .

O.C.G.A. § 18-2-74(b).

Plaintiff presents evidence that Valley Games's transfer of D-Day Dice inventory was made with an actual intent to hinder, delay, or defraud Plaintiff. Plaintiff shows that Mr. Sherwood sent an email to Defendant's employee, Mr. Woodruff, requesting that Defendant "pa[y] for and manage[] [D-Day Dice] under Radiant [Darkstar], not Valley Games." (PSOMF ¶ 34). The email states: "Please, though, if this product could be separate from the Valley Games product so that there's no confusion in case of a seizure." (Id. ¶ 35). Mr. Sherwood, the evidence shows, sent an email to Defendant asking for an arrangement whereby D-Day Dice inventory would be under Defendant's control, and suggesting "a promissory note or something like it to make sure [D-Day Dice inventory] was immune to legal issues." (Id. ¶ 8). These emails were sent after Valley Games "had been sued or threatened with suit." O.C.G.A. § 18-2-74(b)(4). Mr. Burnham, Defendant's president, does not dispute that Valley Games tried to avoid Plaintiff's claims to D-Day Dice inventory, and does not dispute that Plaintiff's lawsuit against Valley Games caused Valley Games to transition D-Day Dice to a new company, Radiant Darkstar. (Id. ¶ 23).[10] These emails and Mr. Burnham's

---

[10]     The Court notes that, to the extent a consignment agreement exists, such an agreement weighs against Defendant. One of the badges of fraud is whether the debtor retained possession or control of the property after transfer. O.C.G.A. § 18-2-74(b)(2). If a consignment agreement existed, Valley Games or Radiant

testimony create an issue of material fact whether Valley Games transferred D-Day Dice to Defendant with actual intent to hinder, delay, or defraud Plaintiff.[11]

### b) Existence of a Transfer

Defendant next argues that it is not a party to a wrongful transfer under the Georgia UFTA, because it "received all inventory from Valley Games or Radiant Darkstar as consignment inventory." (Mot. at 16). The Court thus addresses whether Valley Games transferred D-Day Dice to Defendant.

Under Georgia's UFTA, "[t]ransfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance." O.C.G.A. § 18-2-71(12). The Georgia Supreme Court has held that the "Georgia UFTA defines 'transfer' broadly . . . ." Bishop, 706 S.E.2d at 644 n.5 (holding that there is a "transfer" when co-owner withdraws funds from a joint bank account where the

---

Darkstar retained some interest in the D-Day Dice inventory after the transfer was made, weighing in favor of a finding that the conveyances were fraudulent. See Sherrill, 626 F. Supp. 2d at 1273.

[11]    The parties do not raise address the issue, but Georgia's UFTA provides a defense to transferees "who took in good faith and for a reasonably equivalent value . . . ." O.C.G.A. § 18-2-78(a). The Court finds that there is a triable issue whether Defendant took in "good faith." The issue whether Defendant took for "reasonably equivalent value" may depend on whether a consignment agreement exists, as explained further below.

co-owner of the account funds is a UFTA debtor).  However, the parties do not

cite, and the Court is unable to find, any authority on whether a consignment does

or does not constitute a transfer under Georgia's or any other state's UFTA statute.

A plain reading of Georgia's UFTA does not resolve whether a consignment is a

"direct or indirect . . . disposing of or parting with an asset . . . ."  O.C.G.A. § 18-2-

71(12). [12]  The parties also dispute whether a consignment relationship existed, and

the Court concludes that the facts on the nature of the commercial relationship

between Valley Games and Defendant regarding the D-Day Dice game are

disputed.  This relationship is necessary to resolve before the Court can consider if

Defendant's possession of the goods results in it being liable under Georgia's

---

[12]     Georgia's Uniform Commercial Code ("UCC") provides:
     "Consignment" means a transaction, regardless of its form, in which a
     person delivers goods to a merchant for the purpose of sale and:
     (A) The merchant:
          (i) deals in goods of that kind under a name other than the name of the
          person making delivery;
          (ii) is not an auctioneer; and
          (iii) is not generally known by its creditors to be substantially engaged
          in selling the goods of others;
     (B) With respect to each delivery, the aggregate value of the goods is
     $1,000.00 or more at the time of delivery;
     (C) The goods are not consumer goods immediately before delivery; and
     (D) The transaction does not create a security interest that secures an
     obligation.
O.C.G.A. § 11-9-102(21).  In this arrangement, the consignor does not give up
ownership of the goods.  West's Encyclopedia of American Law, 2d ed. 2008.

UFTA.  The Court thus denies summary judgment on Plaintiff's UFTA claim,

without prejudice to Defendant later moving the Court to decide if Plaintiff's

UFTA claim is legally viable.  Specifically, if at trial a jury determines there was a

consignment to Defendant by Valley Games, through Radiant Darkstar, Defendant

may then move the Court to consider if the consignment constituted a transfer,

under the UFTA, to Defendant.[13]

---

[13]     Defendant also argues that a transfer did not occur because O.C.G.A.
§ 18-2-76, which is titled "when a transfer is made," limits the UFTA's definition
of a transfer.  This section, however, "is intended to be used to determine when a
cause of action arises," presumably for purposes of determining whether a claim is
timely under the applicable statute of limitations.  See DFS Secured Healthcare
Receivables Tr. v. Caregivers Great Lakes, Inc., 384 F.3d 338, 344 n.4 (7th Cir.
2004) (citing UFTA § 6, cmt. 1).  According to this section, a transfer is made with
respect to an asset that is not real property "when the transfer is so far perfected
that a creditor on a simple contract cannot acquire a judicial lien otherwise than
under this article that is superior to the interest of the transferee."  O.C.G.A.
§ 18-2-76(1)(B).  The section also provides that, "[i]f applicable law permits the
transfer to be perfected . . . and the transfer is not so perfected before the
commencement of an action for relief under this article, the transfer is deemed
made immediately before the commencement of the action."  O.C.G.A.
§ 18-2-76(2).  Under Georgia's UCC, a security interest in goods may be perfected
either by filing a financing statement with the state filing office or by taking
possession of the goods.  O.C.G.A. §§ 11-9-313(a); 11-9-310(a).  Here, the transfer
either was perfected—and thus "made" under this section—by Plaintiff taking
possession of the D-Day Dice inventory, or it was not perfected and thus the
"transfer is deemed made immediately before the commencement of th[is] action."
O.C.G.A. § 18-2-76(2).  In any case, Section 18-2-76 does not support Defendant's
argument that a transfer did not occur.

3.   Conspiracy to Defraud

Defendant moves for summary judgment on Plaintiff's claim that Defendant

conspired with Valley Games to cause fraudulent transfers of D-Day Dice.

Defendant argues "there is no cause of action for conspiracy in Georgia," and thus

Defendant is entitled to summary judgment on Plaintiff's conspiracy to defraud

claim.  (Mot. at 20).  Defendant relies on Summit Auto. Grp., LLC v. Clark, 681

S.E.2d 681, 685 (Ga. Ct. App. 2009) to support its argument.  Defendant's reliance

on Summit is misplaced.  In Summit, the Georgia Court of Appeals stated:

> Accurately speaking, there is no such thing as a civil action for
> conspiracy . . . .  Where civil liability for a conspiracy is sought to be
> imposed, the conspiracy of itself furnishes no cause of action.  The
> gist of the action is not the conspiracy alleged, but the tort committed
> against the plaintiff and the damage done thereby.

Id.  The Summit court simply stated that there is no cause of action for civil

conspiracy absent an underlying tort which persons conspired to commit.  Stated

another way:

> A conspiracy is a combination of two or more persons to accomplish
> an unlawful end or to accomplish a lawful end by unlawful means.  To
> recover damages for a civil conspiracy claim, a plaintiff must show
> that two or more persons, acting in concert, engaged in conduct that
> constitutes a tort.  Absent the underlying tort, there can be no liability
> for civil conspiracy.

Miller v. Lomax, 596 S.E.2d 232, 242 (Ga. Ct. App 2004).  In Miller, the Georgia

Court of Appeals reversed the trial court's grant of summary judgment in favor of

a transferee, finding there was a jury question over whether the transferee "participated with [the transferor] in a scheme to effect fraudulent transfers" under the Georgia UFTA.  Id.

The Eleventh Circuit specifically has found that Georgia law permits civil conspiracy claims in the fraudulent transfer context.  In Chepstow Ltd. v. Hunt, 381 F.3d 1077, 1090 (11th Cir. 2004), the Eleventh Circuit held that Georgia law permits civil conspiracy claims against non-transferee aiders and abettors when they are alleged to have conspired with the debtor to defraud the creditor by hindering its collections of an outstanding debt.  Id.; see also Ralls Corp. v. Huerfano River Wind, LLC, 27 F. Supp. 3d 1303, 1334 (N.D. Ga. 2014) (denying motion to dismiss a claim of civil conspiracy where plaintiff had adequately stated a claim under Georgia's UFTA).  Georgia law plainly permits a claim of civil conspiracy to commit a tort, including a fraudulent transfer under the Georgia UFTA.

The record here shows that there are disputed material facts whether Defendant is liable for fraudulent transfers under Georgia's UFTA.  The record evidence is sufficient to raise the issue whether Defendant and Valley Games acted in concert, and, in doing so, engaged in conduct constituting a violation of Georgia's UFTA.  That is, a jury could determine that Defendant and Valley

Games acted in concert to fraudulently transfer D-Day Dice to Radiant Darkstar, and ultimately to Defendant to aid Valley Games to defeat, or at least impair, Plaintiff's interest in the games.[14]  "Because civil conspiracy is by its very nature a secret endeavor, concert of action, amounting to a conspiracy, is best suited for jury resolution."  Miller, 596 S.E.2d at 242.  Defendant did not meet its burden to demonstrate the absence of a genuine dispute, and summary judgment is denied on Plaintiff's civil conspiracy claim.  See Herzog, 193 F.3d at 1246.

> 4.    Fraud Claim

Finally, Defendant moves for summary judgment on Plaintiff's fraud claim. In Georgia, "[f]raud may be actual or constructive."  O.C.G.A. §23-2-51(a).  A plaintiff asserting a cause of action for actual fraud has the burden to show, by clear and convincing evidence, the following elements:  (1) a false representation,

---

[14]    The same evidence that supports Plaintiff's UFTA claim supports his claim for civil conspiracy.  Plaintiff shows that Mr. Sherwood sent an email to Mr. Woodruff requesting that Defendant "pa[y] for and manage[] [D-Day Dice] under Radiant [Darkstar], not Valley Games."  (PSOMF ¶ 34).  The email states: "Please, though, if this product could be separate from the Valley Games product so that there's no confusion in case of a seizure."  (Id. ¶ 35).  Plaintiff also shows that Mr. Sherwood sent an email to Defendant asking for an arrangement whereby D-Day Dice inventory would be under Defendant's control, and suggesting "a promissory note or something like it to make sure [D-Day Dice inventory] was immune to legal issues."  (Id. ¶ 8).  Because the evidence shows that Defendant ultimately complied with Mr. Sherwood's requests, the evidence would allow a jury to conclude that Defendant conspired with Valley Games to engage in tortious conduct.

(2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.  Am. Mgm't Servs. E., LLC v. Fort Benning Family Cmtys., LLC, 774 S.E.2d 233, 249 (Ga. Ct. App. 2015).  "Constructive fraud, in contrast to actual fraud, does not require a finding of an intent to deceive."  Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp., 645 S.E.2d 536, 540 (Ga. Ct. App. 2007).

Defendant argues that Plaintiff cannot show Defendant misrepresented or omitted a material fact, and, to the extent any misrepresentation was made, it was not made with the intention of deceiving Plaintiff, and Plaintiff did not suffer any damage as a result of any misrepresentation.  (Mot. at 21).  Plaintiff argues that emails sent by Paul Chapman, Director of Hobby Sales and Marketing for Defendants in 2012 and 2013, establish Defendant's fraud against Plaintiff.  (Resp. at 19).  According to Plaintiff, emails from Mr. Chapman to Mr. Sherwood show that Mr. Chapman was aware of Plaintiff's lawsuits against Valley Games, and that Mr. Chapman convinced Mr. Sherwood to issue a public statement falsely claiming that D-Day Dice was originally owned by Radiant, not Valley Games.  (Id. at 22-24).  Plaintiff argues that the public statement was "repeated to customers in a convention setting," that it was made to avoid "negative publicity surrounding Plaintiff's claims against Valley Games," and that "Defendant used the statement

to sell D-Day Dice games and avoid Plaintiff's lawful garnishment." (<u>Id.</u> at 21, 24-25).

A claim for fraud requires that the false representation be relied upon by the misled party, and that the misled party suffered damages resulting from his reliance.  <u>See</u> <u>Fort Benning</u>, 774 S.E.2d at 249.  Plaintiff does not offer any evidence that Mr. Chapman's allegedly false representations were directed at or received by Plaintiff, that Plaintiff was misled by the false representations, or that he suffered damages as a result of being misled.  Defendant's motion for summary judgment is granted on Plaintiff's fraud claim.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Publisher Services, Inc.'s Motion for Summary Judgment [36] is **GRANTED IN PART** and **DENIED IN PART**.  Defendant's Motion is **GRANTED** on Plaintiff Philip B. Sauer's fraud claim.  Defendant's Motion is **DENIED** on Plaintiff's claim for civil conspiracy. Defendant's Motion is **DENIED** on Plaintiff's claim under Georgia's UFTA, without prejudice to Defendant moving to dismiss this claim if the commercial relationship between Valley Games and Defendant is determined to be a

consignment.[15]

       **SO ORDERED** this 9th day of March, 2016.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

[15]    The Court does not take any position now whether a consignment relationship would or would not be a transfer under the UFTA.